James E. DUNCAN, Plaintiff-Appellant, Cross–Appellee,

v.

Mr. & Mrs. Harold PECK, Defendants–Appellees, Cross–Appellants,

Highland Coal & Chemical Corporation, Defendant.

Nos. 87–3092, 87–3093.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 23, 1988.

Decided April 25, 1988.

**1262**

Robert F. Ristaneo (argued), Lexington, Ky., for plaintiff-appellant, cross-appellee.

Mark E. Elsener (argued), Porter, Wright, Morris & Arthur, Cincinnati, Ohio, for defendants-appellees, cross-appellants.

Before ENGEL, Chief Judge,[*] and MERRITT and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Plaintiff, James E. Duncan, appeals the November 12, 1986 decision of the United States District Court for the Southern District of Ohio granting summary judgment

[*] The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

**1.** Mrs. Peck was a party to the suit only for the purposes of the requested injunctive relief.

in favor of defendants Peck[1] on the grounds of good faith immunity. Mr. Peck cross-appeals from the portion of the District Court's decision which held that while plaintiff's suit must fail because of defendant's good faith defense, it was not barred by the applicable Ohio statute of limitations. While we disagree with the District Court's reliance on an immunity to support its decision, we agree that the facts support defendant's claim of a good faith defense which entitles him to summary judgment, and dismissal of the suit. Therefore, we need not address the statute of limitations issue raised on the cross-appeal, and we AFFIRM the judgment of the District Court.

### I.

This case originally arose out of a contract dispute between the parties. Defendant Peck sued plaintiff Duncan for $20,000 in the Ohio courts. But before serving process on Duncan, Peck's attorney secured a prejudgment attachment order against shares of stock located in Cincinnati and owned by Duncan, who was not a resident of Ohio. This attachment order was made pursuant to an Ohio statute subsequently declared unconstitutional by the Ohio Supreme Court, as violating the Due Process clause of the Constitution.

After successfully attaching Duncan's property, Peck's attorney attempted to serve process by certified mail. When these letters were returned and after further inquiries did not disclose a valid current address for Duncan, Peck's attorney served notice by publication in a local legal newspaper, which was apparently authorized by an Ohio statute. Because Duncan failed to appear at the appointed time, the court entered a default judgment against him in May, 1979. A sheriff's sale in September of that year executed the judgment and transferred ownership of the stock to Peck.

Since the appeal is limited to the damage issue, we will refer only to defendant Harold Peck in this opinion.

Duncan petitioned the Ohio Court of Common Pleas to set aside the default judgment on the grounds that he never received actual notice of the action against him. After a hearing, the court agreed with him and set aside the judgment. Peck appealed to the Ohio Court of Appeals on the grounds that Duncan had failed to comply with Ohio law which requires a litigant who seeks to set aside a default judgment to show that he had a meritorious defense to the contract action if relief was granted and the default was set aside. The Court of Appeals reversed on the grounds that even if the default judgment had been unconstitutional, Duncan had essentially waived his claim by not properly presenting a meritorious defense. Duncan appealed this decision to both the Ohio Supreme Court and the United States Supreme Court, which both refused to hear the case.[2]

In June, 1980, while his state court appeal was still pending, Duncan filed this 42 U.S.C. § 1983 suit in federal court asking the District Court to enjoin execution of the default judgment and for damages for deprivation of his property interest in the stock because he did not receive the constitutionally required notice of the prejudgment attachment or the default judgment and sheriff's sale. In October, 1982, after the United State Supreme Court had refused to hear Duncan's appeal in the state court action, the District Court granted Peck's motion for summary judgment in Duncan's section 1983 action on res judicata grounds. Duncan appealed the decision to this Court which reversed and remanded the case for further proceedings on the substantive constitutional issues. *See Duncan v. Peck*, 752 F.2d 1135 (6th Cir. 1985). On remand the District Court granted summary judgment in favor of Peck on the grounds that Peck possessed good faith immunity from suit under section 1983.

The District Court held that section 1983 was not intended to "subject private individuals to liability who, in good faith, resorted to state garnishment or prejudgment attachment procedures." The court granted Peck immunity reasoning that because state statutes are presumptively constitutional, private persons should not be penalized for resorting to the courts to vindicate rights which they in good faith had probable cause to believe they possessed. Since a reasonable person at the time would not have known that Ohio's prejudgment attachment procedures were unconstitutional, Peck was entitled to summary judgment based on good faith immunity.

## II.

We begin by examining the scope of the immunity doctrine as developed by the Supreme Court. In spite of the fact that section 1983 allows no immunities on its face, the Supreme Court has repeatedly recognized various forms of immunity for government officials sued under section 1983, including absolute immunity for judges acting in a judicial capacity, and qualified, or good faith immunity for other public officials who are sued for their actions done under the color of state law. These immunities are based on the Supreme Court's assumption that the "members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258, 101 S.Ct. 2748, 2755, 69 L.Ed.2d 616 (1981).

However, the Supreme Court has been cautious about broadening these defenses which include various immunities. As the Supreme Court warned in *Newport*,

it would defeat the promise of the statute to recognize any preexisting immunity without determining both the policies

---

**2.** Subsequently, the Supreme Court, in *Peralta v. Heights Medical Center, Inc.*, —— U.S. ——, 108 S.Ct. 896, 99 L.Ed.2d 75 (1988), held that requiring a showing of a meritorious defense before a state court will set aside a default judgment entered without proper notice, violates due process.

that it serves and its compatability with the purposes of § 1983. Only after careful inquiry into considerations of both history and policy has the Court construed § 1983 to incorporate a particular immunity defense.

453 U.S. at 259, 101 S.Ct. at 2755 (citations omitted). Thus the Supreme Court has adopted a two-part test to determine whether a particular immunity is consistent with the intent of section 1983. The first part requires the party claiming immunity to show that the immunity was recognized at common law. The second part requires a showing of strong public policy reasons for granting such an immunity.[3] The question here is whether, using this two-part test, private parties acting under the color of state law are entitled to immunity from suit when they act in good faith. Because we find no evidence that private parties were immune from suit at common law, and because the various rationales for good faith immunity are inapplicable to private parties, we hold that private parties are not eligible for immunity from suit.

The common law doctrine of immunity from suit originated from the concept that because "the King can do no wrong," it would be a contradiction of his sovereignty to allow him to be sued as of right in his own courts. W. Prosser and W. Keeton, *The Law of Torts*, § 131 (5th Ed.1984). Gradually, this concept was broadened to cover other government officials. *Scheuer v. Rhodes*, 416 U.S. 232, 239, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). Yet, we find no evidence that the common law ever extended the immunity to include private citizens.

In addition to the lack of a common law history of immunity for private individuals, the second part of the test is not met in this case because the strong policy reasons justifying official immunity do not apply to private actors. In *Scheuer*, the Supreme

Court identified two public policy justifications for the doctrine of official immunity:

(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Id.* at 240, 94 S.Ct. at 1688. Neither of these public policy goals are furthered by extending immunity to private parties. Private parties do not face the dilemma of being required by law to use their discretion in a way that might unfairly expose them to lawsuits. The second rationale is also unavailable to a private party because a private party is governed only by self-interest and is not invested with the responsibility of executing the duties of a public official in the public interest.

Our conclusion is supported by the Supreme Court's recent decision in *Forrester v. White*, — U.S. —, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988), which highlights why the policies justifying immunity for public officials do not apply to private parties acting under the color of state law:

Suits for monetary damages are meant to compensate the victims of wrongful actions and to discourage conduct that may result in liability. Special problems arise, however, when government officials are exposed to liability for damages.... [T]he threat of liability can create perverse incentives that operate to inhibit officials in the proper performance of their duties. In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above all are informed by considerations other than the personal

---

**3.** In *Forrester v. White*, — U.S. —, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988), the Supreme Court repeated its holding that when determining whether a defendant is eligible for immunity, courts must look to the functions performed by the individual, and not merely to the status or title of the defendant:

[W]e examine the nature of the functions with which a particular official or class of officials

has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy.

interests of the decisionmaker.... In this way, exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it.

*Id.* (emphasis in original). As the *Forrester* Court points out, the law does not immunize other private parties from suit, no matter how frivolous the claim may be. If there is a legitimate defense to liability, the defendant does not claim immunity from suit, as the defendant does here, but merely moves for summary judgment asserting his substantive defense.

Courts rarely have had opportunities to examine the propriety of immunity for private parties because the overwhelming number of suits under section 1983 are directed at government officials. In fact, the Supreme Court has mentioned the issue only once. In *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court held that a private party could be deemed to be acting under the color of state law when acting in conjunction with state officials in garnishment or attachment proceedings. In a footnote, Justice White, writing for the majority said:

> JUSTICE POWELL is concerned that private individuals who innocently make use of seemingly valid state laws would be responsible, if the law is subsequently held to be unconstitutional, for the consequences of their actions. In our view, however, this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense. A similar concern is at least partially responsible for the availability of a good-faith defense, or qualified immunity, to state officials. We need not reach the question of the availablity of such a defense to private individuals at this juncture.

*Id.* at 942 n. 23, 102 S.Ct. at 2756 n. 23. This footnote may appear on the surface to invite the extension of good faith immunity to private individuals. However, we believe that a close examination of the Supreme Court's language offers the possibility of some sort of defense from liability to private individuals, and does not necessar-

ily suggest the specific defense of immunity. In any case, *Lugar* did not change the Supreme Court's requirement that defendants must show both a historical basis, and strong policy reasons to be eligible for good faith immunity.

Other circuits have addressed this issue, with mixed results. The First and Ninth Circuits have rejected the use of good faith immunity for private parties, while the Fifth, Eighth, and Eleventh Circuits have endorsed it in some instances. The Ninth Circuit, citing *Lugar* for the proposition that private parties may be able to assert a good faith defense has held that "there is no good faith immunity under section 1983 for private parties who act under color of state law to deprive an individual of his or her constitutional rights." *Howerton v. Gabica,* 708 F.2d 380, 385 n. 10 (9th Cir. 1983). Also in a case decided before *Lugar,* the First Circuit held that good faith immunity was not available to private citizens where a deaf woman was involuntarily sterilized. *Downs v. Sawtelle,* 574 F.2d 1 (1st Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978). The *Downs* court held that immunity was not appropriate for private citizens because the background of tort liability from which section 1983 should be read includes immunity for public officials, but not for private parties. "Private parties simply are not confronted with the pressures of office, the often split-second decisionmaking or the constant threat of liability facing police officers, governors, and other public officials." *Id.* at 16.

On the other hand, in *Folsom Investment Co. v. Moore,* 681 F.2d 1032 (5th Cir.1982), the Fifth Circuit held that defendants who invoked a presumptively valid attachment statute were entitled to good faith immunity if they neither knew or should have known that the statute was unconstitutional. After noting the Supreme Court's comments in *Lugar,* the court reasoned that immunity for private parties is not derived from official immunity, but is based on the "important public interest in permitting ordinary citizens to rely on presumptively valid state laws, in

shielding citizens from monetary damages when they reasonably resort to a legal process later held to be unconstitutional, and in protecting a private citizen from liability when his role in any unconstitutional action is marginal." *Id.* at 1037.

The *Folsom* court noted that even without the important policy reasons justifying good faith immunity, relying on established attachment procedures would not have subjected people to tort liability prior to the passage of section 1983, because the common law required that the plaintiff must prove that the "attachment was sued out wrongfully, maliciously, and without probable cause," *id.* at 1038, before a defendant could be held liable for the torts of malicious prosecution or wrongful attachment.

In *Buller v. Buechler*, 706 F.2d 844 (8th Cir.1983), the Eighth Circuit addressed the same issue. The *Buller* court used the history of the common law defenses to malicious prosecution suits as a justification for bestowing immunity on private individuals. The court found that the common law recognized a good faith "defense based on probable cause ... [because] a citizen should not be penalized for resorting to the courts to vindicate rights that he or she in good faith had probable cause to believe that he or she possessed." *Id.* at 851. The court then held that this common law *defense* suggests "the recognition of a qualified *immunity*" in this case. *Id.* (emphasis added).

Most recently, the Eleventh Circuit in *Jones v. Preuit & Mauldin*, 808 F.2d 1435 (11th Cir.1987), agreed with the analysis of the Fifth and Eighth Circuits and held that good faith immunity exists for private parties. However, the court reversed the district court's dismissal because the defend-

ants in the case failed to clearly demonstrate that they acted in good faith.

■■■ We believe that the courts who endorsed the concept of good faith immunity for private individuals improperly confused good faith immunity with a good faith defense.[4] Good faith immunity is designed to protect defendants from the difficulties of defending a suit by dismissing the case before the parties have engaged in costly and time consuming discovery. Since it is based on an objective standard, the issue can often be decided on the pleadings. A good faith defense, on the other hand, is likely to be based in large part on the facts of the case, with the suit only being dismissed after trial, or on summary judgment if the defendant can show that there is no material dispute as to the facts. In short, good faith immunity is based on an objective analysis, while a good faith defense includes subjective factors. While the Fifth, Eighth and Eleventh Circuits have correctly set forth the historical and policy reasons for a good faith defense, we find no justification for the subtle, yet significant transformation of this defense into an immunity.[5]

We also believe that adopting a good faith immunity in this case would require courts to either abandon the Supreme Court's use of an objective test to determine immunity, or to substantially change the nature of the torts of malicious prosecution and wrongful attachment, which rely on subjective elements. If a defendant is eligible for good faith immunity, a court must determine, under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), whether the defendant's actions fall within the scope of the immunity by determining whether the defendant's conduct violated "clearly estab-

---

4. In spite of the fact that these courts seem to use defenses and immunities interchangeably, both the Fifth and the Eleventh Circuits acknowledge that immunities and defenses are separate legal doctrines. *Folsom Inv. Co. v. Moore*, 681 F.2d 1032, 1038 (5th Cir.1982) ("Of course [the good faith defense to wrongful attachment actions] is not the same as an immunity, but it is grounded in many of the same types of public policy justifications supporting an immunity."); *Jones v. Preuit & Mauldin* 808 F.2d 1435, 1441 (11th Cir.1987) ("Although such

[good faith] defenses technically are not immunities, Section 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" [citation omitted] ).

5. In fact, the Fifth Circuit, in *Folsom*, 681 F.2d at 1038, admitted that they "merely transformed a common law defense extant at the time of § 1983's passage into an immunity."

lished statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. *Harlow* made clear that this is an objective test, and that if the right was not clearly established, the defendant is entitled to immunity, and the court should dismiss the case without further discovery.[6] Yet the underlying torts of malicious prosecution and wrongful attachment allowed a subjective defense of good faith. *See* W. Prosser, *supra*, at § 120.

The courts which have endorsed qualified immunity have been unable to rectify these conflicting standards. The *Buller* and *Jones* courts added a subjective component to the *Harlow* standard by stating the test as whether the private parties "know or reasonably should know" that the attachment violated clearly established rights.[7] This means that the Eighth and Eleventh Circuits examine both the objective component of what a reasonable person would know, and also look into the fact specific subjective component of what this particular defendant knew. Such a standard runs afoul of *Harlow* because it often would require parties to engage in substantial discovery.[8]

Thus, if we were to endorse qualified immunity for private parties, and to apply the immunity as the Supreme Court instructed in *Harlow*, not only would we be improperly extending the immunity doctrine far beyond its underlying rationales, but we would also be significantly distorting the common law defenses to malicious prosecution and wrongful attachment torts by substituting an objective test for good faith for the common law's subjective standard.

### III.

We turn now to whether the common law good faith defense to malicious prosecution and wrongful attachment cases is appropriate here. In order to be successful in a suit for malicious prosecution or wrongful attachment, a plaintiff must show, among other things, that the defendant abused the judicial process by pursuing the case with malice, and without probable cause. W. Prosser, *supra*, §§ 119, 120. While probable cause and malice often have complicated meanings, in malicious prosecution cases, "[t]he layman's ignorance of the law has been taken into account in the almost universal holding that probable cause is established where the prosecution was instituted with the advice of counsel." *Id.* at § 119. This defense protects the important public interests identified by the *Folsom* and *Buller* courts by eliminating liability for private parties who, in good faith, rely on the advice of their attorneys, and invoke presumptively valid state statutes.

Therefore, if defendant, in good faith relied on his attorney's advice that attaching plaintiff's property was a valid legal procedure, then the defendant has shown probable cause for his actions, which defeats plaintiff's malicious prosecution suit.[9] In this case, defendant Peck introduced affidavits in the District Court from him and his attorney stating that he acted solely on

**6.** In *Manion v. Michigan Board of Medicine,* 765 F.2d 590 (6th Cir.1985), this Court acknowledged that in *Harlow* the Supreme Court "abandoned the subjective prong of the previous objective/subjective standard for determining qualified immunity and placed reliance, instead, upon an objective standard." *Id.* at 597.

**7.** *Jones,* 808 F.2d at 1441. *See also, Buller,* 706 F.2d at 851. The *Folsom* Court remanded the case to the District Court on the immunity issue and thus did not reach the issue of how to apply immunity to private parties.

**8.** The *Harlow* Court reasoned that "[j]udicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the de-

posing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government." 457 U.S. at 817, 102 S.Ct. at 2737–38. Clearly, the important policy reasons for granting immunity from suit to government officials would not extend to private parties, who can be adequately protected from liability by merely establishing an affirmative good faith defense to the suit.

**9.** Of course, defendant's reliance on the advice of counsel would also have a bearing on whether defendant acted maliciously, but because plaintiff must show both that defendant acted maliciously and without probable cause, we need not specifically address the malice question.

the advice of his attorney. Plaintiff has offered no evidence rebutting these affidavits. In fact, there is no evidence that defendant himself was even aware of the precise procedural steps that his attorney was employing in his case. It would be manifestly unjust to hold a layman liable for improper legal techniques, in the absence of any evidence that defendant knew precisely what his attorney was doing, and whether it was improper.[10]

This evidence leads us to the conclusion that because there is no material question of fact as to defendant's good faith reliance on his attorney's decision to attach Duncan's property, summary judgment should be granted to defendant Peck on the grounds that Duncan has not, as a matter of law, presented sufficient evidence for the case to go forward. Because we believe that summary judgment should be granted on the basis of Peck's good faith reliance on his attorney, we need not address the other possible reasons for dismissing this suit, nor do we decide the statute of limitations issue raised by Peck on the cross-appeal.

Accordingly, we AFFIRM the judgment of the District Court.

---

10. Our conclusion is also supported by the Supreme Court's rulings in the analogous area of respondeat superior. In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that in § 1983 actions, an employer could not be held liable for damages resulting from constitutional violations committed by employees unless the employees acted pursuant to a policy of the employer. According to the Court, "when Congress' rejection of the only form of vicarious liability presented to it is combined with the absence of any language in Section 1983 which can easily be construed to

create respondeat superior liability, the inference that Congress did not intend to impose such liability is quite strong." *Monell,* at 693 n. 57, 98 S.Ct. at 2037 n. 57.

Essentially the Supreme Court's rejection of respondeat superior liability in § 1983 actions reaffirms the notion that § 1983 requires that the defendant personally cause and be responsible for the infringement of the plaintiff's constitutional rights. In this case that same notion supports our conclusion that if any constitutional rights were violated, they were violated by the actions of Peck's attorney, and that these actions could not be properly imputed to Peck himself.